**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | |
|---|---|
| **ANDRE CRAVENS**, on behalf of himself and all others similarly situated, | No. 9:24-cv-80400 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| **GARDA CL SOUTHEAST, INC., GARDAWORLD CASHLINK LLC, GARDAWORLD CASH SERVICES, INC., d/b/a GARDAWORLD CASH U.S.,** | |
| Defendants. | |

Andre Cravens ("Plaintiff"), through his attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants Garda CL Southeast, Inc., GardaWorld CashLINK LLC, GardaWorld Cash Services, Inc., d/b/a GardaWorld Cash U.S., ("Garda" or "Defendants"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to his own actions, counsel's investigations, and facts of public record.

**NATURE OF ACTION**

1.      This class action arises from Garda's failure to protect highly sensitive data.

2.      Garda is "one of the world's largest privately owned integrated security and risk company [sic]."[1]

---

[1] *Home Page*, GARDA, https://www.garda.com/ (last visited April 1, 2024).

3.      As such, Garda stores a litany of highly sensitive personal identifiable information ("PII") and protected health information ("PHI")—together "PII/PHI"—about its current and former employees and/or customers. But Garda lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

4.      It is unknown for precisely how long the cybercriminals had access to Garda's network before the breach was discovered. In other words, Garda had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to its current and former employees' and/or customers' PII/PHI.

5.      On information and belief, cybercriminals were able to breach Garda's systems because Garda failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII/PHI. In short, Garda's failures placed the Class's PII/PHI in a vulnerable position—rendering them easy targets for cybercriminals.

6.      Plaintiff is a Data Breach victim, having received a breach notice—attached as Exhibit A.  He brings this class action on behalf of himself, and all others harmed by Garda's misconduct.

7.      The exposure of one's PII/PHI to cybercriminals is a bell that cannot be unrung. Before this data breach, its current and former employees' and/or customers' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

## PARTIES

8.      Plaintiff, Andre Cravens, is a natural person and citizen of Indiana. He resides in Mishawaka, Indiana where he intends to remain.

9.     Defendant, Garda CL Southeast, Inc., is a Profit Corporation incorporated in Georgia with its principal place of business at 2000 NW Corporate Boulevard, Boca Raton, Florida, 33431.

10.     Defendant, GardaWorld Cash Services, Inc., is a General Corporation incorporated in Delaware with its principal place of business at 2000 NW Corporate Boulevard, Boca Raton, Florida, 33431.

11.     Defendant, GardaWorld CashLINK LLC, is Limited Liability Company incorporated in Delaware with its principal place of business at 2000 NW Corporate Boulevard, Boca Raton, Florida, 33431.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Plaintiff and Garda are citizens of different states. And there are over 100 putative Class members.

13.     This Court has personal jurisdiction over Garda because it is headquartered in Florida, regularly conducts business in Florida, and has sufficient minimum contacts in Florida.

14.     Venue is proper in this Court because Garda's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND

***Garda Collected and Stored the PII/PHI of Plaintiff and the Class***

15.     Garda is "one of the world's largest privately owned integrated security and risk company [sic]."[2]

16.     As part of its business, Garda receives and maintains the PII/PHI of thousands of its current and former employees and/or customers.

17.     In collecting and maintaining the PII/PHI, Garda agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class members themselves took reasonable steps to secure their PII/PHI.

18.     Under state and federal law, businesses like Garda have duties to protect its current and former employees' and/or customers' PII/PHI and to notify them about breaches.

19.     Garda recognizes these duties, declaring in its "Privacy Notice" that:

a.      "At GardaWorld, we understand the importance of privacy and are committed to protecting your personal data."[3]

b.      "We only use your personal data where permitted by applicable law."[4]

c.      "We will obtain your express consent before sharing your personal data[.]"[5]

d.      "We require all third parties to respect the security of your personal data and to treat it in accordance with applicable law."[6]

e.      "We ensure that your personal data is protected by requiring all our group companies to follow the same rules when processing your personal data."[7]

---

[2] *Home Page*, GARDA, https://www.garda.com/ (last visited April 1, 2024).
[3] *Privacy Notice*, GARDA, https://www.garda.com/privacy-notice (last visited April 1, 2024).
[4] *Id*.
[5] *Id*.
[6] *Id*.
[7] *Id*.

f.      "We have implemented appropriate security measures to prevent your personal data from being accidentally lost or used, accessed, modified or communicated in an unauthorized manner."[8]

g.      "In addition, we restrict access to your personal data to employees, agents, contractors and other third parties who need to know it for business purposes. They will only process your personal data in accordance with our instructions and are subject to an obligation of confidentiality."[9]

h.      "We have procedures in place to deal with any suspected personal data breach[.]"[10]

i.      "GardaWorld is committed to protecting your personal information throughout its life cycle in accordance with its privacy practices and in compliance with the requirements of applicable laws."[11]

j.      "GardaWorld has adopted an internal data governance policy that sets out the principles governing the protection of personal data in the context of its operations."[12]

k.      "GardaWorld recognizes the importance of the protection, confidentiality and security of the personal data it processes in the course of its activities, and of making its employees and partners aware of this."[13]

---

[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*

l.     "[W]e do not share your personal information with third parties without your consent, except where permitted by law."[14]

m.     "GardaWorld must take reasonable steps to reduce the risk of serious harm and review its practices to prevent similar privacy incidents in the future."[15]

***Garda's Data Breach***

20.     From October 30, 2023, until November 16, 2023, Garda were hacked when "an unauthorized actor accessed some of our facility systems in Florida" and then "copied [files] from those systems."[16]

21.     Worryingly, Garda was unable to detect the Data Breach until November 16, 2023.[17] Thus, cybercriminals had a *full 17 days* to peruse and exfiltrate PII/PHI before being detected.[18]

22.     Because of Garda's Data Breach, at least the following types of PII/PHI were compromised:

a.     names;

b.     addresses;

c.     Social Security numbers;

d.     driver's license numbers;

e.     date of birth;

f.     health insurance information;

---

[14] *Id*.
[15] *Id*.
[16] *Data Breach Notifications*, MAINE ATTY GEN,
https://apps.web.maine.gov/online/aeviewer/ME/40/b259cad1-d4ba-46cf-9a2a-05ff391ebfcc.shtml (last visited April 1, 2024).
[17]
[18]

      g.    health benefit information;

      h.    medical information.[19]

23.     In total, Garda injured at least 39,928 persons—via the exposure of their PII/PHI—in the Data Breach.[20] Upon information and belief, these 39,928 persons include its current and former employees and/or customers.

24.     And yet, Garda waited over until March 22, 2024, before it began notifying the class—a full 144 days after the Data Breach began.[21]

25.     Thus, Garda kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

26.     And when Garda did notify Plaintiff and the Class of the Data Breach, Garda acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, warning Plaintiff and the Class:

      a.    "We also encourage you to remain vigilant against incidents of identity theft and fraud by engaging in the following best practices . . . [c]hange your passwords regularly and make sure they are secure."[22]

      b.    "[B]e vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity."[23]

---

[19] *Id.*; *Data Security Breach Reports*, ATTY GEN TEXAS, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited April 1, 2024).
[20] *Data Breach Notifications*, MAINE ATTY GEN, https://apps.web.maine.gov/online/aeviewer/ME/40/b259cad1-d4ba-46cf-9a2a-05ff391ebfcc.shtml (last visited April 1, 2024).
[21] *Id.*
[22] *Id.*
[23] *Id.*

      c.      "[C]ontact the Federal Trade Commission and/or the Attorney General's office in your home state . . . for information on how to prevent or avoid identity theft."[24]

27.      Garda failed its duties when its inadequate security practices caused the Data Breach. In other words, Garda's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII/PHI. And thus, Garda caused widespread injury and monetary damages.

28.      Since the breach, Garda has declared that "[w]e took additional steps to secure our systems."[25] But this is too little too late. Simply put, these measures—which Garda now recognizes as necessary—should have been implemented *before* the Data Breach.

29.      On information and belief, Garda failed to adequately train its employees on reasonable cybersecurity protocols or implement reasonable security measures.

30.      Further, the Notice of Data Breach shows that Garda cannot—or will not—determine the full scope of the Data Breach, as Garda has been unable to determine precisely what information was stolen and when.

31.      Garda has done little to remedy its Data Breach. True, Garda has offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly insufficient to compensate Plaintiff and Class members for the injuries that Garda inflicted upon them.

---

[24] *Id*.
[25] *Id*.

32.     Because of Garda's Data Breach, the sensitive PII/PHI of Plaintiff and Class members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class members.

33.     Worryingly, the cybercriminals that obtained Plaintiff's and Class members' PII/PHI appear to be the notorious cybercriminal group "Metaencryptor."[26]

34.     Notably, the cyber security company "Hackmanac" reported that Metaencryptor exfiltrated 300 gigabytes of data—and then threatened to *publish* the data unless a ransom was paid by December 22, 2023.[27]

## GARDAWORLD

| | |
|---|---|
| **Victim website:** | garda.com |
| **Victim country:** | Canada |
| **Attacker name:** | Metaencryptor |
| **Attacker class:** | Cybercrime |
| **Attack technique:** | Ransomware |
| **Ransom demand:** | N/A |
| **Exfiltrated data amount:** | 300 GB |
| **Exfiltrated data type:** | N/A |
| **Leaked data:** | / |
| **Ransom deadline:** | 22nd Dec 23 |
| **Cyber Risk Factor:** | 4 |

---

[26] *Hacks of Today*, HACKMANAC, (Dec. 7, 2023) https://hackmanac.com/news/hacks-of-today-07-12-2023.
[27] *Id.*

35.    Likewise, several other cyber security companies reported that Metaencryptor was responsible for the Data Breach.[28]



| Group | Title | Date |
|---|---|---|
| **Metaencryptor** | Garda | 2023-12-07 |
| Garda | | |

| Data Breach Report | |
|---|---|
| Victim | garda.com |
| Threat Actor | Metaencryptor |
| Date Discovered | Dec 08, 2023 |
| Description | Garda World Security Corporation provides security solutions, cash logistics, and risk consulting services. |
| Leak Size | Unknown |

---

[28] *Metaencryptor*, RANSOMLOOK, https://www.ransomlook.io/group/metaencryptor (last visited April 1, 2024); *Garda*, BREACHSENSE, https://www.breachsense.com/breaches/garda-data-breach/ (last visited April 1, 2024); ThreatMon Advanced Ransomware Monitoring (@TMRansomMonitor), TWITTER (Dec. 7, 2023) https://twitter.com/TMRansomMonitor/status/1732771508731142588.



36.     Critically, Metaencryptor is notorious for publishing stolen data.[29] For example, a third-party report reveals that Metaencryptor "is a new ransomware gang that **published** the data of 12 victims in August 2023."[30]

37.     And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[31]

---

[29] *Ransomware review: September 2023*, MALWAREBYTES (Sept. 12, 2023) https://www.malwarebytes.com/blog/threat-intelligence/2023/09/ransomware-review-september-2023.
[30] *Id.*
[31] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

38.     Thus, on information and belief, Plaintiff's and the Class's stolen PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

***Plaintiff's Experiences and Injuries***

39.     Plaintiff Andre Cravens is a former employee of Garda—having worked for Garda from approximately 2019 until 2021.

40.     Thus, Garda obtained and maintained Plaintiff's PII/PHI.

41.     As a result, Plaintiff was injured by Garda's Data Breach.

42.     As a condition of his employment with Defendant, Plaintiff provided Garda with his PII/PHI. Garda used that PII/PHI to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII/PHI in order to obtain employment and payment for that employment.

43.     Plaintiff provided his PII/PHI to Garda and trusted the company would use reasonable measures to protect it according to Garda's internal policies, as well as state and federal law. Garda obtained and continues to maintain Plaintiff's PII/PHI and has a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

44.     Plaintiff reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of PII/PHI.

45.     Plaintiff does not recall ever learning that his information was compromised in a data breach incident—other than the breach at issue here.

46.     Plaintiff received a Notice of Data Breach on March 28, 2024.

47.     Thus, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

48.     Through its Data Breach, Garda compromised Plaintiff's:

    a.     name;

    b.     Social Security number;

    c.     driver's license number;

    d.     date of birth;

    e.     insurance information;

    f.     benefit information;

    g.     health information.

49.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Garda directed Plaintiff to take those steps in its breach notice.

50.    And in the aftermath of the Data Breach, Plaintiff has suffered from a spike in spam and scam phone calls.

51.    Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

52.    Because of Garda's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

53.    Plaintiff suffered actual injury from the exposure and theft of his PII/PHI—which violates his rights to privacy.

54.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII/PHI. After all, PII/PHI is a form of intangible property—property that Garda was required to adequately protect.

13

55.     Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Garda's Data Breach placed Plaintiff's PII/PHI right in the hands of criminals.

56.     Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

57.     Today, Plaintiff has a continuing interest in ensuring that his PII/PHI—which, upon information and belief, remains backed up in Garda's possession—is protected and safeguarded from additional breaches.

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

58.     Because of Garda's failure to prevent the Data Breach, Plaintiff and Class members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

      a.     loss of the opportunity to control how their PII/PHI is used;

      b.     diminution in value of their PII/PHI;

      c.     compromise and continuing publication of their PII/PHI;

      d.     out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

      e.     lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

      f.     delay in receipt of tax refund monies;

      g.     unauthorized use of their stolen PII/PHI; and

      h.     continued risk to their PII/PHI—which remains in Garda's possession—and is thus as risk for futures breaches so long as Garda fails to take appropriate measures to protect the PII/PHI.

59.    Stolen PII/PHI is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII/PHI can be worth up to $1,000.00 depending on the type of information obtained.

60.    The value of Plaintiff and Class's PII/PHI on the black market is considerable. Stolen PII/PHI trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "Dark Web"—further exposing the information.

61.    It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII/PHI far and wide.

62.    One way that criminals profit from stolen PII/PHI is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data— first the stolen PII/PHI, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

63.    The development of "Fullz" packages means that the PII/PHI exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet.

64.    In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII/PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class members, and it is reasonable for any trier of fact, including this

Court or a jury, to find that Plaintiff and other Class members' stolen PII/PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

65.     Garda disclosed the PII/PHI of Plaintiff and Class members for criminals to use in the conduct of criminal activity. Specifically, Garda opened up, disclosed, and exposed the PII/PHI of Plaintiff and Class members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII/PHI.

66.     Garda's failure to promptly and properly notify Plaintiff and Class members of the Data Breach exacerbated Plaintiff and Class members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII/PHI and take other necessary steps to mitigate the harm caused by the Data Breach.

***Garda Knew—Or Should Have Known—of the Risk of a Data Breach***

67.     Garda's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

68.     In 2021, a record 1,862 data breaches occurred, exposing approximately 293,927,708 sensitive records—a 68% increase from 2020.[32]

69.     Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have

---

[32] *See 2021 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2022) https://notified.idtheftcenter.org/s/.

lesser IT defenses and a high incentive to regain access to their data quickly."[33]

70.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Garda's industry, including Defendant.

***Garda Failed to Follow FTC Guidelines***

71.     According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

72.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[34]  The FTC declared that, *inter alia*, businesses must:

      a.     protect the personal customer information that they keep;

      b.     properly dispose of personal information that is no longer needed;

      c.     encrypt information stored on computer networks;

      d.     understand their network's vulnerabilities; and

      e.     implement policies to correct security problems.

73.     The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

74.     Furthermore, the FTC explains that companies must:

---

[33] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[34] *Protecting Personal Information: A Guide for Business,* FEDERAL TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

a.    not maintain information longer than is needed to authorize a transaction;

b.    limit access to sensitive data;

c.    require complex passwords to be used on networks;

d.    use industry-tested methods for security;

e.    monitor for suspicious activity on the network; and

f.    verify that third-party service providers use reasonable security measures.

75.    The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

76.    In short, Garda's failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former employees' and/or customers' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Garda Failed to Follow Industry Standards***

77.    Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

78.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email

management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

79.     Garda failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

80.     These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Garda opened the door to the criminals—thereby causing the Data Breach.

***Garda Violated HIPAA***

81.     HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[35]

---

[35] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

82.     HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII/PHI and PHI is properly maintained.[36]

83.     The Data Breach itself resulted from a combination of inadequacies showing Garda failed to comply with safeguards mandated by HIPAA. Garda's security failures include, but are not limited to:

a.      failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b.      failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c.      failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d.      failing to ensure compliance with HIPAA security standards by Garda's workforce in violation of 45 C.F.R. § 164.306(a)(4);

e.      failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to

---

[36] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f.     failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g.     failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h.     failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i.     failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

84.     Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrate Garda failed to comply with safeguards mandated by HIPAA regulations.

## CLASS ACTION ALLEGATIONS

85.     Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII/PHI was compromised in the Data Breach discovered by Garda in November 2023, including all those individuals who received notice of the breach.

21

86.     Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Garda has a controlling interest, any Garda officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

87.     Plaintiff reserves the right to amend the class definition.

88.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

89.     Ascertainability. All members of the proposed Class are readily ascertainable from information in Garda's custody and control. After all, Garda already identified some individuals and sent them data breach notices.

90.     Numerosity. The Class members are so numerous that joinder of all Class members is impracticable. Upon information and belief, the proposed Class includes at least 39,928 members.

91.     Typicality. Plaintiff's claims are typical of Class members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

92.     Adequacy. Plaintiff will fairly and adequately protect the proposed Class's common interests. His interests do not conflict with Class members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

93.     Commonality and Predominance. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting

individual Class members—for which a class wide proceeding can answer for all Class members. In fact, a class wide proceeding is necessary to answer the following questions:

    a.    if Garda had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII/PHI;

    b.    if Garda failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    c.    if Garda were negligent in maintaining, protecting, and securing PII/PHI;

    d.    if Garda breached contract promises to safeguard Plaintiff and the Class's PII/PHI;

    e.    if Garda took reasonable measures to determine the extent of the Data Breach after discovering it;

    f.    if Garda's Breach Notice was reasonable;

    g.    if the Data Breach caused Plaintiff and the Class injuries;

    h.    what the proper damages measure is; and

    i.    if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

94.    Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense that individual litigation against Garda would require. Thus, it would be practically impossible for Class members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties

and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

95.     Plaintiff incorporates by reference paragraphs 1–94 as if fully set forth herein.

96.     Plaintiff and the Class (or their third-party agents) entrusted their PII/PHI to Garda on the premise and with the understanding that Garda would safeguard their PII/PHI, use their PII/PHI for business purposes only, and/or not disclose their PII/PHI to unauthorized third parties.

97.     Garda owed a duty of care to Plaintiff and Class members because it was foreseeable that Garda's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII/PHI in a data breach. And here, that foreseeable danger came to pass.

98.     Garda has full knowledge of the sensitivity of the PII/PHI and the types of harm that Plaintiff and the Class could and would suffer if their PII/PHI was wrongfully disclosed.

99.     Garda owed these duties to Plaintiff and Class members because they are members of a well-defined, foreseeable, and probable class of individuals whom Garda knew or should have known would suffer injury-in-fact from Garda's inadequate security practices. After all, Garda actively sought and obtained Plaintiff and Class members' PII/PHI.

100.    Garda owed—to Plaintiff and Class members—at least the following duties to:

a.     exercise reasonable care in handling and using the PII/PHI in its care and custody;

b.     implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c.     promptly detect attempts at unauthorized access;

d.     notify Plaintiff and Class members within a reasonable timeframe of any breach to the security of their PII/PHI.

101.    Thus, Garda owed a duty to timely and accurately disclose to Plaintiff and Class members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class members to take appropriate measures to protect their PII/PHI, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

102.    Garda also had a duty to exercise appropriate clearinghouse practices to remove PII/PHI it was no longer required to retain under applicable regulations.

103.    Garda knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII/PHI of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

104.    Garda's duty to use reasonable security measures arose because of the special relationship that existed between Garda and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class (or their third-party agents) entrusted Garda with their confidential PII/PHI, a necessary part of obtaining services from Defendant.

105.     Under the FTC Act, 15 U.S.C. § 45, Garda had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff and Class members' PII/PHI.

106.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII/PHI entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Garda's duty to protect Plaintiff and the Class members' sensitive PII/PHI.

107.     Garda violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII/PHI and not complying with applicable industry standards as described in detail herein. Garda's conduct was particularly unreasonable given the nature and amount of PII/PHI Garda had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

108.     Similarly, under HIPAA, Garda had a duty to follow HIPAA standards for privacy and security practices—as to protect Plaintiff's and Class members' PHI.

109.     Garda violated its duty under HIPAA by failing to use reasonable measures to protect its PHI and by not complying with applicable regulations detailed *supra*. Here too, Garda's conduct was particularly unreasonable given the nature and amount of PHI that Garda collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

110.     The risk that unauthorized persons would attempt to gain access to the PII/PHI and misuse it was foreseeable. Given that Garda hold vast amounts of PII/PHI, it was inevitable that

unauthorized individuals would attempt to access Garda's databases containing the PII/PHI — whether by malware or otherwise.

111.    PII/PHI is highly valuable, and Garda knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII/PHI of Plaintiff and Class members' and the importance of exercising reasonable care in handling it.

112.    Garda improperly and inadequately safeguarded the PII/PHI of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

113.    Garda breached these duties as evidenced by the Data Breach.

114.    Garda acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class members' PII/PHI by:

    a.    disclosing and providing access to this information to third parties and

    b.    failing to properly supervise both the way the PII/PHI was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

115.    Garda breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII/PHI of Plaintiff and Class members which actually and proximately caused the Data Breach and Plaintiff and Class members' injury.

116.    Garda further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class members' injuries-in-fact.

117.    Garda has admitted that the PII/PHI of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

118.    As a direct and traceable result of Garda's negligence and/or negligent supervision, Plaintiff and Class members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

119.    And, on information and belief, Plaintiff's PII/PHI has already been published— or will be published imminently—by cybercriminals on the Dark Web.

120.    Garda's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII/PHI by criminals, improper disclosure of their PII/PHI, lost benefit of their bargain, lost value of their PII/PHI, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Garda's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**<u>SECOND CAUSE OF ACTION</u>**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

121.    Plaintiff incorporates by reference paragraphs 1–94 as if fully set forth herein.

122.    Plaintiff and Class members either directly contracted with Garda or Plaintiff and Class members were the third-party beneficiaries of contracts with Defendant.

123.    Plaintiff and Class members (or their third-party agents) were required to provide their PII/PHI to Garda as a condition of receiving products, services, and/or employment provided by Defendant. Plaintiff and Class members (or their third-party agents) provided their PII/PHI to Garda or its third-party agents in exchange for Garda's products, services, and/or employment.

124.    Plaintiff and Class members (or their third-party agents) reasonably understood that a portion of the funds they paid (or funds derived from their labor with) Garda would be used to pay for adequate cybersecurity measures.

125.    Plaintiff and Class members (or their third-party agents) reasonably understood that Garda would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Garda's duties under state and federal law and its internal policies.

126.    Plaintiff and the Class members (or their third-party agents) accepted Garda's offers by disclosing their PII/PHI to Garda or its third-party agents in exchange for products, services, and/or employment.

127.    In turn, and through internal policies, Garda agreed to protect and not disclose the PII/PHI to unauthorized persons.

128.    In its Privacy Policy, Garda represented that they had a legal duty to protect Plaintiff's and Class Member's PII/PHI.

129.    Implicit in the parties' agreement was that Garda would provide Plaintiff and Class members (or their third-party agents) with prompt and adequate notice of all unauthorized access and/or theft of their PII/PHI.

130.    After all, Plaintiff and Class members (or their third-party agents) would not have entrusted their PII/PHI to Garda (or their third-party agents) in the absence of such an agreement with Defendant.

131.    Plaintiff and the Class (or their third-party agents) fully performed their obligations under the implied contracts with Defendant.

132.    The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair

29

dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

133.    Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

134.    Garda materially breached the contracts it entered with Plaintiff and Class members (or their third-party agents) by:

    a.    failing to safeguard their information;

    b.    failing to notify them promptly of the intrusion into its computer systems that compromised such information.

    c.    failing to comply with industry standards;

    d.    failing to comply with the legal obligations necessarily incorporated into the agreements; and

    e.    failing to ensure the confidentiality and integrity of the electronic PII/PHI that Garda created, received, maintained, and transmitted.

135.    In these and other ways, Garda violated its duty of good faith and fair dealing.

136.    Garda's material breaches were the direct and proximate cause of Plaintiff's and Class members' injuries (as detailed *supra*).

137.    And, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

138.     Plaintiff and Class members (or their third-party agents) performed as required under the relevant agreements, or such performance was waived by Garda's conduct.

**THIRD CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiff and the Class)**

139.     Plaintiff incorporates by reference paragraphs 1–94 as if fully set forth herein.

140.     Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII/PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

141.     Garda owed a duty to its current and former employees and/or customers, including Plaintiff and the Class, to keep this information confidential.

142.     The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class members' PII/PHI is highly offensive to a reasonable person.

143.     The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class (or their third-party agents) disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

144.     The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

145.     Garda acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

146.     Garda acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

147.     Acting with knowledge, Garda had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

148.     As a proximate result of Garda's acts and omissions, the private and sensitive PII/PHI of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages (as detailed *supra*).

149.     And, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

150.     Unless and until enjoined and restrained by order of this Court, Garda's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII/PHI are still maintained by Garda with their inadequate cybersecurity system and policies.

151.     Plaintiff and the Class have no adequate remedy at law for the injuries relating to Garda's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Garda's inability to safeguard the PII/PHI of Plaintiff and the Class.

152.     In addition to injunctive relief, Plaintiff, on behalf of himself and the other Class members, also seeks compensatory damages for Garda's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

153.    Plaintiff incorporates by reference paragraphs 1–94 as if fully set forth herein.

154.    This claim is pleaded in the alternative to the breach of implied contract claim.

155.    Plaintiff and Class members (or their third-party agents) conferred a benefit upon Defendant. After all, Garda benefitted from using their PII/PHI and labor to provide services and/or facilitate employment.

156.    Garda appreciated or had knowledge of the benefits it received from Plaintiff and Class members (or their third-party agents).

157.    Plaintiff and Class members (or their third-party agents) reasonably understood that Garda would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Garda's duties under state and federal law and its internal policies.

158.    Garda enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class members' PII/PHI.

159.    Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Garda instead calculated to avoid its data security obligations at the expense of Plaintiff and Class members by utilizing cheaper, ineffective security measures. Plaintiff and Class members, on the other hand, suffered as a direct and proximate result of Garda's failure to provide the requisite security.

160.    Under principles of equity and good conscience, Garda should not be permitted to retain the full value of Plaintiff's and Class members' employment and/or payment because Garda failed to adequately protect their PII/PHI.

161.    Plaintiff and Class members have no adequate remedy at law.

162.     Garda should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class members—all unlawful or inequitable proceeds that it received because of its misconduct.

**FIFTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Class)**

163.     Plaintiff incorporates by reference paragraphs 1–94 as if fully set forth herein.

164.     Given the relationship between Garda and Plaintiff and Class members, where Garda became guardian of Plaintiff's and Class members' PII/PHI, Garda became a fiduciary by its undertaking and guardianship of the PII/PHI, to act primarily for Plaintiff and Class members, (1) for the safeguarding of Plaintiff and Class members' PII/PHI; (2) to timely notify Plaintiff and Class members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Garda did and does store.

165.     Garda has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of Garda's relationship with them—especially to secure their PII/PHI.

166.     Because of the highly sensitive nature of the PII/PHI, Plaintiff and Class members (or their third-party agents) would not have entrusted Defendant, or anyone in Garda's position, to retain their PII/PHI had they known the reality of Garda's inadequate data security practices.

167.     Garda breached its fiduciary duties to Plaintiff and Class members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class members' PII/PHI.

168.     Garda also breached its fiduciary duties to Plaintiff and Class members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

169.     As a direct and proximate result of Garda's breach of its fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

### SIXTH CAUSE OF ACTION
**Violation of Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. §§ 501.201, *et seq.***
**(On Behalf of Plaintiff and the Class)**

170.     Plaintiff incorporates by reference paragraphs 1–94 as if fully set forth herein.

171.     This cause of action is brought under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

172.     The purpose of FDUTPA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

173.     Another purpose of FDUTPA is to construe consumer protection as "consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(3).

174.     Plaintiff and Class members all constitute "[c]onsumers" under FDUTPA because they are all "individual[s]." Fla. Stat. § 501.203.

175.     Plaintiff and Class members each constitute an "[i]nterested party or person" under FDUTPA because they are all "affected by a violation" of FDUTPA. Fla. Stat. § 501.203.

176.     FDUTPA applies to Garda because Garda engages in "[t]rade or commerce" as defined as "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." Fla. Stat. § 501.203.

177.     FDUTPA declares as unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

178.     FDUTPA provides that "due consideration be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a)(1) of the Trade Commission Act." Fla. Stat. § 501.204(2).

179.     Relevant here, is that "[v]iolation[s]" of FDUTPA is broadly defined to include violations of:

  a.     "Any rules promulgated pursuant to the Federal Trade Commission Act, 15 U.S.C. ss. 41 *et seq*." Fla. Stat. § 501.203.

  b.     "The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts." Fla. Stat. § 501.203.

  c.     "Any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." Fla. Stat. § 501.203.

180.     Under FCRA, HIPAA (42 U.S.C. § 1302d et seq.), the FTCA, and Florida law (Fla. Stat. § 456.057 and § 501.171), Garda was required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiff's and Class members' PII/PHI. Garda was also under an obligation expressly under Florida law, where Garda is headquartered and managed, to adequately protect Plaintiff's and Class members' PII/PHI.

181.     Moreover, FDUTPA requires that Garda (1) take reasonable measures to protect and secure data in electronic form containing PII/PHI; (2) take reasonable measures to dispose of

or destroy PII/PHI; and (3) provide notice to consumers and consumer reporting agencies subject to the FCRA when a data security incident occurs that compromises PII/PHI. Fla. Stat. §§ 501.171.

182.    Garda violated FDUTPA by, *inter alia*:

a.    failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class members' PII/PHI, which was a direct and proximate cause of the Data Breach;

b.    failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.    failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class members' PII/PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq*., which was a direct and proximate cause of the Data Breach;

d.    omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class members' PII/PHI; and

e.    omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class members' PII/PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq*.

183.    Garda's omissions were material because they were likely to deceive reasonable consumers about the adequacy of Garda's data security and ability to protect the confidentiality of their PII/PHI.

184.    Garda intended to mislead Plaintiff and Class members and induce them to rely on its omissions.

185.    Had Garda disclosed to Plaintiff and Class members (or their third-party agents) that its data systems were not secure—and thus vulnerable to attack—Garda would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Garda accepted the PII/PHI that Plaintiff and Class members (or their third-party agents) entrusted to it while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff and Class members acted reasonably in relying on Garda's omissions, the truth of which they could not have discovered through reasonable investigation.

186.    Garda acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiff's and Class members' rights.

187.    As a direct and proximate result of Garda's unfair and deceptive acts and practices, Plaintiff and Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII/PHI.

188.    And, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

189.    Plaintiff and Class members seek declaratory judgement that Garda's practices were unreasonable and inadequate and thus caused the Data Breach.

190.    Plaintiff and Class members seek injunctive relief enjoining the wrongful acts described supra and requiring Garda to use and maintain proper standards for data security including, inter alia, proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing. Fla. Stat. § 501.211(1).

191.    Plaintiff and Class members seek all monetary and non-monetary relief allowed by law. Plaintiff seeks actual damages, attorneys' fees, and costs under Fla. Stat. §§ 501.2105, 501.211(2).

## SEVENTH CAUSE OF ACTION
### Declaratory Judgment
### (On Behalf of Plaintiff and the Class)

192.    Plaintiff incorporates by reference paragraphs 1–94 as if fully set forth herein.

193.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

194.    In the fallout of the Data Breach, an actual controversy has arisen about Garda's various duties to use reasonable data security. On information and belief, Plaintiff alleges that Garda's actions were—and *still* are—inadequate and unreasonable. And Plaintiff and Class members continue to suffer injury from the ongoing threat of fraud and identity theft.

195.    Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a.     Garda owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

    b.     Garda has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

    c.     Garda breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

    d.     Garda breaches of its duties caused—and continues to cause—injuries to Plaintiff and Class members.

196.    The Court should also issue corresponding injunctive relief requiring Garda to use adequate security consistent with industry standards to protect the data entrusted to it.

197.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Garda experiences a second data breach.

198.    And if a second breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff and Class members' injuries.

199.    If an injunction is not issued, the resulting hardship to Plaintiff and Class members far exceeds the minimal hardship that Garda could experience if an injunction is issued.

200.    An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class members, and the public at large.

**PRAYER FOR RELIEF**

Plaintiff and Class members respectfully request judgment against Garda and that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

B.    Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C.    Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D.    Enjoining Garda from further unfair and/or deceptive practices;

E.    Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F.    Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G.    Awarding attorneys' fees and costs, as allowed by law;

H.    Awarding prejudgment and post-judgment interest, as provided by law;

I.    Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J.    Granting other relief that this Court finds appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims so triable.

Date: April 2, 2024

Respectfully submitted,

By: /s/*Joshua R. Jacobson*
**JACOBSON PHILLIPS PLLC**
Joshua R. Jacobson (FBN 1002264)
joshua@jacobsonphillips.com
Jacob L. Phillips (FBN 120130)
jacob@jacobsonphillips.com
478 E. Altamonte Dr., Ste. 108-570
Altamonte Springs, FL 32701
Telephone: (407) 612-2206

**TURKE & STRAUSS LLP**
Samuel J. Strauss*
613 Williamson Street, Suite 201
Madison, Wisconsin 53703
Telephone: (608) 237-1775
Facsimile: (608) 509-4423
sam@turkestrauss.com

*\*Pro hac vice forthcoming*

*Attorneys for Plaintiff and Proposed Class*